**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KEITH ALLEN DETWILER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-214 |
| | ) | |
| v. | ) | Judge Donetta W. Ambrose |
| | ) | Magistrate Judge Susan Baxter |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

It is respectfully recommended that the court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

### II.  REPORT

**A.  BACKGROUND**

1.  Procedural History

Keith Allen Detwiler ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  Plaintiff filed for benefits, claiming a complete inability to work as of January 1, 2009, due to severe depression, seizures, behavioral problems,

and high blood pressure. (R. at 80 – 87, 106).[1] Despite his claims, Plaintiff was denied benefits under the Act. (R. at 1 – 4, 7 – 23, 43 – 52). Having exhausted all administrative remedies, this matter now comes before the court on cross motions for summary judgment. (ECF Nos. 8, 11).

2. General Background

Plaintiff was born on May 28, 1966, was forty three years of age at the time of his application for benefits, and was forty four years of age at the time of his administrative hearing before the ALJ. (R. at 102). Plaintiff completed only the eighth grade, but later obtained his GED. (R. at 29, 107). He was enrolled in college for one year, and completed vocational training for design and marketing. (R. at 29, 107). His job history included employment as a construction worker and as a mechanic. (R. at 108). Although Plaintiff no longer worked, he completed odd-jobs around his mother's rental properties, in one of which he resided with a friend. (R. at 28 – 30). Plaintiff also had a girlfriend and pet dog. (R. at 119). He subsisted on food stamps and welfare benefits, and received healthcare through the state. (R. at 29).

3. Treatment History

Plaintiff initially began treatment for his mental health issues at Community Health Net. On September 4, 2009, Plaintiff was seen by Merja Wright, M.D. at Community Health Net. (R. at 274). She noted that Plaintiff had complaints of depression and a desire to avoid other people, for several years. (R. at 274). Plaintiff had recently started taking Prozac and was considered to be "doing quite well with that." (R. at 274). Plaintiff was also prescribed Metoprolol XL for nervousness. (R. at 274).

On October 19, 2009, Plaintiff was admitted to Saint Vincent Health Center ("St. Vincent") in Erie, Pennsylvania, for complaints of depression and a suicide attempt/gesture. (R.

---

[1]     Citations to ECF Nos. 6 – 6-13, the Record, *hereinafter*, "R. at __."

at 188, 195 – 96).  Plaintiff had been receiving treatment in the form of Prozac for the previous three months, but allegedly to no effect.  (R. at 188, 195 – 96).  Plaintiff described to hospital personnel that he had been experiencing significant difficulty following his divorce five years ago, and missed his children – who now lived in Minnesota.  (R. at 188, 195 – 96).  He had recently been feeling sad and was considering taking his own life, so he called a local crisis hotline.  (R. at 188, 195 – 96).  When he could not get through, he cut his left wrist and contacted police.  (R. at 188, 190, 195 – 96).  Plaintiff was noted to have been consuming alcohol at the time.  (R. at 190, 203).  Following his admission to the hospital, Plaintiff was administered an increased dosage of Prozac.  (R. at 188).  Hospital staff observed substantial improvement in Plaintiff's mood and functioning.  (R. at 188).  Once he was no longer considered to be a danger to himself, Plaintiff was discharged on October 23, 2009.  (R. at 188).  His discharge diagnosis was mild-to-moderate major depressive disorder, without psychosis.  (R. at 188).  He was assigned a global assessment of functioning ("GAF") score of 25 – 30[2] at admission, but was assigned a GAF score of 55[3] at discharge.  (R. at 188).

Plaintiff thereafter received outpatient medication management at St. Vincent with nurse practitioner Mary Beth Moreland, C.R.N.P.  At an evaluation on December 8, 2009, Ms. Moreland noted that Plaintiff had not experienced any thoughts of self-harm since his discharge from the hospital.  (R. at 229).  However, Plaintiff complained of poor sleep, poor appetite, and weight gain.  (R. at 229).  Ms. Moreland observed Plaintiff to be alert and oriented.  (R. at 229).

---

[2]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas." *Id.*

[3]     An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

He made good eye contact during his evaluation. (R. at 229). She prescribed Prozac and Trazadone. (R. at 229). She assigned a GAF score of 50[4]. (R. at 229).

On February 2, 2010, Plaintiff followed up with Ms. Moreland for a medication check, and explained that he had stopped taking Prozac due to nausea, and stopped taking Trazadone because he did not believe it helped him to sleep. (R. at 227). Plaintiff denied experiencing suicidal thoughts, but claimed that he was experiencing seizures and irritability. (R. at 227). Ms. Moreland observed Plaintiff to be alert and oriented, and he made good eye contact. (R. at 227). She considered him to be depressed, and prescribed Remeron and Zoloft as alternative medications. (R. at 227). She assigned a GAF score of 50. (R. at 227).

On March 9, 2010, Plaintiff returned to see Ms. Moreland for medication management. (R. at 226). He stated that it was his blood pressure medication which had been causing stomach issues, and that he was ready to resume taking Prozac. (R. at 226). He denied experiencing seizure, but complained of occasional suicidal ideation and problematic sleep. (R. at 226). Ms. Moreland observed Plaintiff to be alert and oriented, animated, and depressed. (R. at 226). She assigned a GAF score of 55, and prescribed Prozac. (R. at 226).

On April 23, 2010, Plaintiff was admitted to the hospital following his arrival at St. Vincent's emergency department for severe depression, thoughts of self-harm, suicidal ideation, and ten three inch cuts to the left arm from a box-cutter. (R. at 353, 355, 358). Plaintiff was noted to have been drinking. (R. at 353). Blood test results revealed that Plaintiff was extremely intoxicated. (R. at 354). His GAF score at admission was 30. (R. at 359). Upon the administration of psychiatric medications, Plaintiff's mental state improved significantly. (R. at 360). He denied suicidal ideation. (R. at 360). Once stable, Plaintiff was discharged from the

---

[4]     An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

hospital on April 27, 2010. (R. at 360). His diagnosis was major depressive disorder, and his GAF score was 45. (R. at 360).

On May 4, 2010, Ms. Moreland again evaluated Plaintiff for medication management. (R. at 285). She reported that Plaintiff did not have suicidal thoughts. (R. at 285). He had recently been admitted to the hospital for cutting himself, but stated that he did not want to die, but needed to talk with somebody. (R. at 285). His sleep had improved, as had his appetite. (R. at 285). Plaintiff was observed to be alert and oriented, he made good eye contact, and he was smiling. (R. at 285). Ms. Moreland considered to his mood to be "more stable." (R. at 285). He was continued on Prozac and Trazadone. (R. at 285). He was assigned a GAF score of 55. (R. at 285).

On May 21, 2010, Plaintiff was again admitted to St. Vincent's for complaints of depression and suicidal ideation. (R. at 346, 348). He had thoughts of cutting himself. (R. at 346, 348). He was extremely intoxicated. (R. at 346, 348). Plaintiff's GAF score was estimated to be between 32 and 35[5]. (R. at 349). Plaintiff was started on psychiatric medications and a detoxification protocol. (R. at 350). Plaintiff's mental status improved significantly. (R. at 350). He was considered to be stable enough to discharge on May 24, 2010. (R. at 350). His discharge diagnoses were major depressive disorder and alcohol abuse. (R. at 350). His GAF score was 45. (R. at 350).

On July 8, 2010, Plaintiff began seeking psychiatric care through Safe Harbor Behavioral Health ("Safe Harbor"). (R. at 292). He explained that St. Vincent's outpatient program did not have sufficient counselors to provide him with one-on-one counseling. (R. at 292). At intake,

---

[5]        An individual with a GAF score of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

Plaintiff described experiencing depression and anxiety following his divorce. (R. at 292). Plaintiff's history of hospitalizations for suicide attempts was noted. (R. at 292). Plaintiff complained of feeling hopeless, helpless, and worthless. (R. at 292). His suicidal thoughts would "come and go." (R. at 292). He often isolated himself, experience sleep disturbance, and had issues with low energy, poor concentration and attention, and anhedonia. (R. at 292). Plaintiff claimed to have stopped drinking heavily approximately one year prior. (R. at 293). He admitted experiencing seizures during withdrawal. (R. at 293). Plaintiff was observed to be oriented, cooperative, alert, and appropriately groomed, he had spontaneous speech, appropriate affect, organized and relevant thought processes, intact memory, average intellect, good insight, and fair judgment. (R. at 295). Plaintiff was diagnosed with recurrent major depressive disorder, and was assigned a GAF score of 50. (R. at 296).

On July 14, 2010, Plaintiff presented at St. Vincent's emergency department due to extreme depression and an alleged desire to cut himself. (R. at 329, 331). Plaintiff was noted to have consumed "a lot" of alcohol. (R. at 329, 331, 336). Plaintiff was unable to contract for safety, and was admitted to the hospital for management of his depression and alcohol abuse. (R. at 333). His GAF score was 30. (R. at 337). Plaintiff was re-started on psychiatric medications, he tolerated the medications well, and his condition stabilized. (R. at 338). Plaintiff was discharged on July 19, 2010. (R. at 338). At that time, he was alert and oriented, had good insight and judgment, had logical and linear thought processes, had relevant speech, had appropriate mood and affect, had intact cognition, and was not suicidal. (R. at 338). His diagnoses were major depression and alcohol abuse. (R. at 338). His GAF score was 45. (R. at 338).

On August 19, 2010, Plaintiff visited his primary care physician Dolan Wenner, D.O. (R. at 308). Dr. Wenner listed Plaintiff's current disorders as hypertension, bipolar disorder, and hyperlipidemia. (R. at 308). Plaintiff informed Dr. Wenner that he had been in rehabilitation for alcohol abuse, and was "doing much better." (R. at 308). Plaintiff stated that he was "feeling really great." (R. at 308). Dr. Wenner noted that Plaintiff's blood pressure and weight had improved since he entered rehabilitation. (R. at 308).

On September 3, 2010, Plaintiff underwent an evaluation at Safe Harbor. (R. at 298). He recounted experiencing sadness, anhedonia, irritability, edginess, racing thoughts, sleep disturbance, and low energy for years. (R. at 298). Suicidal ideation waxed and waned. (R. at 298). He admitted to cutting behavior. (R. at 298). He admitted to a long history of substance abuse, although he did not view his current use as problematic. (R. at 298). Plaintiff stated that he occasionally drank "a couple beers" to help himself fall asleep. (R. at 298). Plaintiff's history of hospitalization in October 2009, April 2010, May 2010, and July 2010 for suicidal ideation/attempt was noted. (R. at 298).

Plaintiff was observed to be in no acute distress, was alert and oriented, had normal speech, had euthymic mood and bright affect, was calm and relaxed, smiled and joked – at times – inappropriately, was easy to engage, had well organized thought, had limited insight, and had intact judgment. (R. at 299). Plaintiff was believed to minimize his alcohol use. (R. at 299). He denied suicidal ideation. (R. at 299). He was diagnosed with recurrent major depressive disorder, unspecified alcohol dependence, and personality disorder, NOS. (R. at 300). He was assigned a GAF score of 45. (R. at 300).

On October 1, 2010, Plaintiff attended his first medication check at Safe Harbor. (R. at 301). He felt "terrible," nervous, and anxious, because he was awaiting the results of a test on a

mass found on his lung. (R. at 301). Otherwise, he was "doing pretty good," and noticed slight improvement with medications. (R. at 301). He was not sleeping well, however. (R. at 301). He was in treatment for his alcohol use. (R. at 301). Plaintiff was observed to be alert and oriented, to exhibit fair hygiene and grooming, to be pleasant, to have euthymic mood and congruent affect, to have mild anxiety and depression, to have organized thought, to have intact memory and cognition, and to have fair insight and judgment. (R. at 301). Plaintiff denied suicidal ideation. (R. at 301). Plaintiff's diagnoses remained the same, but his GAF score was 48. (R. at 301).

Plaintiff was seen in St. Vincent's emergency department on October 10, 2010 due to an anxiety attack. (R. at 325). He was noted to have been consuming alcohol. (R. at 325). The attack was prompted by stress over the results of a CT scan of Plaintiff's lungs. (R. at 321). Plaintiff was pacing and expressed a desire to cut himself. (R. at 321). This behavior was witnessed by Plaintiff's brother, and help was called. (R. at 321). Plaintiff denied suicidal ideation at the hospital. (R. at 321). He did not meet the criteria for admission. (R. at 322). Once Plaintiff was considered to be mentally stable, and his anxiety was resolved, he was sent home. (R. at 322). He was to follow up with Safe Harbor on October 4, 2010. (R. at 328).

On November 19, 2010, Plaintiff attended a medication check at Safe Harbor. (R. at 366). He reported feeling "terrible." (R. at 366). He described experiencing increased anxiety and irritability. (R. at 366). He denied feeling depressed or suicidal, however, and his energy level, sleep, and appetite were improved. (R. at 366). He was clear and coherent, his mood was euthymic, his affect was congruent, his thoughts were well organized and goal oriented, and his insight, impulse control, and judgment were good. (R. at 366). His diagnoses included recurrent

major depressive disorder, unspecified alcohol dependence, and personality disorder, NOS. (R. at 366). His GAF score was 50. (R. at 367).

On January 14, 2011, Plaintiff reported to his Safe Harbor therapist that he felt bored and depressed, but was not anxious or angry. (R. at 364). He continued to consume alcohol. (R. at 364). He appeared to be unkempt and his hygiene was fair. (R. at 364). However, his mood was euthymic and his affect was congruent, his thoughts were well organized and goal oriented, and his insight, impulse control, and judgment were good. (R. at 364). His diagnoses and GAF score remained the same. (R. at 364 – 65).

On February 15, 2011, Plaintiff appeared at his last medication check at Safe Harbor on record. (R. at 362). Plaintiff reported feeling slightly more energetic and motivated. (R. at 362). His depression was "5" on a scale of "1 – 10." (R. at 362). He was anxious about seeking disability benefits. (R. at 362). His grooming and hygiene were good, his speech was clear and coherent, his mood was euthymic and his affect was congruent, he was animated, smiling, and pleasant, his thoughts were well organized and goal oriented, and his insight, impulse control, and judgment were good. (R. at 362). Plaintiff denied suicidal ideation. (R. at 362). His diagnoses remained the same, but his GAF score was increased to 53. (R. at 362 – 63).

4. Functional Capacity Assessments

On February 19, 2010, state agency evaluator Jason Rasefske, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 217 – 23). Based upon his review of the medical record, Dr. Rasefske concluded that the evidence supported a finding of impairment in the way of hypertension. (R. at 217). Plaintiff was not considered to have any exertional limitations. (R. at 218 – 20). There was no support in the record for the assertion that

Plaintiff suffered from seizure disorder, and there was no evidence suggesting Plaintiff required more than conservative treatment for his hypertension.  (R. at 222).

On March 22, 2010, Glenn Bailey, Ph.D. completed a mental status evaluation of Plaintiff on behalf of the Bureau of Disability Determination.  (R. at 230 – 41).  Plaintiff arrived on-time for the evaluation, was polite, and was adequately groomed.  (R. at 232).  Plaintiff informed Dr. Bailey that he was tired of living.  (R. at 234).  Plaintiff had a medical history of hospitalization for suicide attempts.  (R. at 234).  Plaintiff described a tumultuous, sometimes abusive, childhood.  (R. at 232 – 33).  He also had a difficult divorce, and left behind three children.  (R. at 234).  At the time of the evaluation, Plaintiff informed Dr. Bailey that he was engaging in medication management at St. Vincent, but not individual therapy.  (R. at 234).

Dr. Bailey observed Plaintiff to be depressed, anxious, isolated, easily irritable, and restless.  (R. at 235).  A cognitive examination was near normal.  (R. at 236).  No risk factors for suicide were exhibited.  (R. at 236).  Plaintiff had goal-directed and relevant thought, he spoke clearly and concisely, he had average intellect, his impulse control was inconsistent, his concentration was normal, and he was fairly reliable – although, there were times when he was embarrassed or appeared selective about self-disclosures.  (R. at 235 – 39).  Dr. Bailey diagnosed Plaintiff with recurrent major depression, occasional cannabis abuse, avoidant personality disorder, and borderline personality disorder.  (R. at 239).  He assigned a GAF score of 50.  (R. at 239).  Plaintiff's prognosis was poor.  (R. at 238).  Dr. Bailey opined that he would experience only moderate limitation interacting with supervisors and co-workers, and in responding appropriately to pressure and changes in a work setting.  (R. at 230).

On March 30, 2010, state agency evaluator Kerry Brace, Psy.D. completed a Mental RFC of Plaintiff.  (R. at 242 – 45).  Based upon a review of the medical record, Dr. Brace concluded

that the evidence supported finding impairment in the way of affective disorders, anxiety-related disorders, personality disorders, and substance addiction disorders. (R. at 242). Nonetheless, Dr. Brace indicated that Plaintiff experienced no more than insignificant-to-moderate limitation in all areas of functioning. (R. at 242 – 43). Despite his impairments, Dr. Brace believed that Plaintiff was capable of working production oriented jobs requiring independent decision making, and involving asking simple questions and accepting instruction. (R. at 244). Dr. Brace gave great weight to the assessment of Dr. Bailey. (R. at 244).

On May 4, 2010, nurse practitioner Moreland completed a Pennsylvania Department of Public Welfare Employability Assessment Form on Plaintiff's behalf. (R. at 371 – 72). She indicated that as a result of major depression, Plaintiff was temporarily disabled between December 8, 2009, and May 30, 2011. (R. at 371 – 72). No objective medical findings or narrative accompanied the assessment.

5. <u>Administrative Hearing</u>

Plaintiff testified that he could not work due to depression, lack of motivation, and forgetfulness. (R. at 30 – 31). He claimed that his medications made him dizzy and drowsy, and provided little help. (R. at 30, 33). He also reported difficulty sleeping. (R. at 29). Plaintiff acknowledged that he had attempted suicide in the past, but was not suicidal at the time of the hearing. (R. at 31). He admitted to drug and alcohol abuse problems in his past, but claimed that these issues were now managed. (R. at 32). He stated that he only occasionally drank a "couple of beers" to help him fall asleep. (R. at 32).

An average day for Plaintiff involved getting up around noon, cleaning, tending to his dog, preparing meals, watching television, and attending appointments. (R. at 29, 31 – 32). He would also complete odd jobs around his mother's rental properties. (R. at 30). Plaintiff would

watch television with friends.  (R. at 30).  He was capable of going shopping, but was somewhat bothered by being around other people.  (R. at 30 – 31).  Plaintiff did not have a driver's license, and relied upon mass transit and rides from friends for transportation.  (R. at 28).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be capable of obtaining work existing in significant numbers in the nation economy if limited to jobs requiring no more than simple, routine, low stress work, only occasional changes in setting, only occasional decision making, and only occasional interaction with the public, co-workers, and supervisors.  (R. at 35).  The vocational expert replied that such a person would be capable of working as a "stocker," with 240,000 positions available in the national economy, or in "janitorial work," with over one million positions available, or as a "motel cleaner," with 248,000 positions available.  (R. at 35).

The ALJ then inquired whether the hypothetical person would be able to sustain full-time employment if expect to be off-task at least twenty percent of any given work day.  (R. at 36).  The vocational expert responded that no jobs would be available to such a person.  (R. at 36).  The vocational expert went on to explain that no more than one absence per month would be acceptable to a typical employer, and no more than two fifteen minute work breaks and one thirty minute lunch break are customarily provided by employers.  (R. at 36).  Exceeding these limits would preclude full-time employment.  (R. at 36).

**B.**   **ANALYSIS**

   1.  Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[6], 1383(c)(3)[7]; *Schaudeck v.*

---

[6]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d Cir. 1986).

---

[7]    Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

2. <u>Discussion</u>

The ALJ determined that Plaintiff suffered severe medically determinable impairment in the way of depression, anxiety, personality disorder, and alcohol abuse. (R. at 12). As a result, Plaintiff could be expected to maintain no more than simple, routine, low stress work, involving only occasional changes in work setting, occasional work-related decision-making, and occasional interaction with the public, co-workers, and supervisors in mostly isolated settings. (R. at 14). Nonetheless, the ALJ determined that the testimony of the vocational expert supported a finding that Plaintiff could still obtain a significant number of full-time jobs in the national economy. (R. at 17 – 18). Therefore, the ALJ concluded that Plaintiff was not eligible for DIB or SSI. (R. at 18).

Plaintiff objects to the decision of the ALJ, arguing that he committed error by failing to find that Plaintiff had experienced repeated episodes of decompensation, by failing to give greater weight to the GAF scores on record, by failing to seek a treating source's opinion as to Plaintiff's mental limitations, by failing to give Plaintiff's subjective complaints full credit, and by relying upon vocational expert testimony that was inconsistent with the Dictionary of Occupational Titles. (ECF No. 9 at 8 – 17). Defendant counters that the ALJ properly supported his decision with substantial evidence from the record, and should be affirmed. (ECF No. 12 at 13 – 23). The court agrees with Defendant.

It is first argued that the ALJ should have found that Plaintiff experienced repeated episodes of decompensation. (ECF No. 9 at 8 – 9). Plaintiff believes that such a finding should have been included within the ALJ's RFC assessment, but fails to explain for what purpose. Under 20 C.F.R., Pt. 404, Subpt. P, App'x 1, 12.00 (Mental Disorders), in order to meet the criteria for a finding of disability at Step 3, the listings often require evidence of repeated

episodes of decompensation in addition to requiring that the episodes each be of extended duration. *See* 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listings 12.02, 12.03, 12.04, 12.05, 12.06, 12.07, 12.08, and 12.10. Assuming that Plaintiff's hospitalizations qualified as episodes of decompensation, 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.00(C)(4) provides that:

> The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

Plaintiff provides no argument or evidence suggesting that his episodes met this durational requirement. Further, in light of Plaintiff's failure to suggest that a finding of repeated episodes of decompensation, alone, would have had an appreciable effect on the outcome of this case, the court finds no error on the part of the ALJ. *See Rutherford v. Barnhart*, 399 F. 3d 546, 553 (3d Cir. 2005).

Plaintiff next claims that the ALJ's decision to accord little weight to the GAF scores on record was error requiring remand. (ECF No. 9 at 9 – 12). The ALJ assigned Plaintiff's GAF scores only "slight weight," due to the wide variability of the scores within the treatment record. (R. at 16). The ALJ believed that the scores did not present an accurate "baseline" for Plaintiff's functionality. (R. at 16). He also believed that the scores appeared to be too low, based upon the objective evidence on record. (R. at 16). Plaintiff asserts that the ALJ improperly ignored what were actually consistently low GAF scores, and claimed that only one such score on record was over 50. (ECF No. 9 at 10).

Plaintiff's argument is unavailing, however. The court first notes that there were several scores above 50 within the medical record, that Plaintiff's lowest scores were associated with

alcohol abuse and hospitalization, and that the scores generally improved over time.  These facts

notwithstanding, the ALJ's rejection of the GAF scores was not in error.  The United States

Court of Appeals for the Third Circuit has held that a "GAF score does not have a direct

correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v.

Astrue,* 351 F. App'x 714, 715 – 16 (3d Cir. 2009) (citing 66 Fed. Reg. 50764-5 (2000)).  Lower

courts in this circuit have "further recognized that while GAF scores can indicate an individual's

capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF

score was meant to indicate an impairment of the ability to work, a GAF score does not establish

disability." *Bracciodieta-Nelson v. Comm'r of Soc. Sec.*, 782 F. Supp. 2d 152, 165 (W.D. Pa.

2011) (citing *Coy v. Astrue*, 2009 WL 2043491 at *14 (W.D. Pa. 2009)).

There is no requirement that the ALJ mention GAF scores with specificity in his or her

discussion, and an ALJ's failure to include a GAF score in his or her discussion is considered to

be "harmless error where a claimant has not explained how the GAF score would have itself

satisfied the requirements for disability in light of potentially contradictory evidence on record."

*Id.*; *Coy*, 2009 WL 2043491 at *14; *Rios v. Astrue*, 2010 WL 3860458 at *8 (E.D. Pa. 2010)

(citing *Purnell v. Astrue*, 662 F. Supp. 2d 402, 415 (E.D. Pa. 2009)).  Further, where a treating

source has failed to provide specific limitations findings to explain a given GAF score, or to tie

the GAF score into some explanation of a claimant's ability to work, the Court of Appeals for the

Third Circuit has held that a court cannot be expected to provide a specific assessment of the

GAF score.  *Gilroy*, 351 F. App'x at 716.

This is not a case where the ALJ merely cherry picked evidence to bolster a conclusion –

he also accorded Plaintiff's high GAF scores minimal weight as a measure of his overall capacity

for work.  *Cf. Bonani v. Astrue*, 2010 WL 5481551, *8 (W.D. Pa. October 15, 2010).  The ALJ

instead relied upon the written narratives of Plaintiff's treating medical providers – notes which included the GAF scores at issue. *Bracciodieta-Nelson*, 782 F. Supp. 2d at 165. As such, the court finds that the ALJ's discussion did not constitute error requiring remand. *See Coy*, 2009 WL 2043491 at *14 ("The failure to mention the scores specifically does not constitute reversible error. The Court declines plaintiff's invitation to remand solely so the ALJ can insert the GAF scores into his decision.").

Plaintiff also argues that while the ALJ gave great weight to the findings of Dr. Bailey, he failed to accord the same level of consideration to other medical opinions by Plaintiff's treating sources. (ECF No. 9 at 12 – 14). To this end, Plaintiff asserts that the ALJ had a responsibility to seeking the opinion of a treating source with respect to Plaintiff's mental functional limitations. (*Id.*). Claimant does not specify which treating source should have been consulted, or why, and does not put forth evidence suggesting that a functional capacity assessment completed by a treating source would have changed the outcome of the case.

The ALJ has a duty to develop a record both fully and fairly, and must secure evidence relevant to establishing a claimant's right to disability benefits. *Ventura v. Shalala*, 55 F. 3d 900, 902 (3d Cir. 1995). Yet, a claimant still bears the ultimate burden of producing sufficient evidence to demonstrate disability. *Schwartz v. Halter*, 134 F. Supp. 2d 640, 656 (E.D. Pa. 2001). Although the Act "provides an applicant with assistance to prove his claim, the ALJ does not have a duty to search for all of the relevant evidence available, because such a requirement would shift the burden of proof." *Id.* (citing *Hess v. Sec'y of Health, Educ., and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974)). 20 C.F.R. §§ 404.1512(e), 416.912(e), 404.1517 and 416.917 provide that an ALJ should seek a consultative examination with respect to a claimant's

impairments and attendant limitations when existing evidence is insufficient for such a disability determination to be made. *See also Schwartz*, 134 F. Supp. 2d at 657 – 68.

However, there is no mandate that an ALJ require a treating source to produce evidence which does not exist, i.e. a "treating source opinion of mental limitations of function," as claimed by Plaintiff. (ECF No. 9 at 13). In this case, as in all disability benefits cases, the burden was upon Plaintiff to produce such an evaluation; he did not. Presently, the ALJ compiled Plaintiff's medical record, ordered a consultative evaluation, and reviewed RFC assessments completed by state agency evaluators. If Plaintiff desired one of his treating sources to evaluate his functional capacity, he should have sought such an evaluation. The failure to do so on the part of the ALJ was not error requiring remand.

Plaintiff next argues that the ALJ did not adequately assess his subjective complaints, specifically, his ability to handle stress[8]. (ECF No. 15 – 16). The court finds this argument to be without merit. An ALJ must treat subjective complaints similarly to objective medical reports, and weigh the evidence before him. *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). The ALJ is required to assess both intensity and persistence, and determine the extent to which a claimant's ability to work is impaired. *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints. *Id.* Allegations must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F. 3d at 122.

---

[8]    Incidentally, Plaintiff also argues that the ALJ failed to consider "evidence of brain trauma and consistent complaints of loss of memory and other cognitive disorders, which her treating physicians indicate would preclude her from work." (ECF No. 9 at 15 – 16). The court will disregard this portion of Plaintiff's argument, not only because there is no objective support in the medical record for such an assertion, but also because Plaintiff is anomalously referred to as "she," and "her," leading the court to believe that Plaintiff's counsel included irrelevant information from another case in the brief. (ECF No. 9 at 15 – 16).

Here, the ALJ analyzed Plaintiff's activities of daily living, social functioning, and concentration, persistence, and pace, as reported in the objective medical record, and compared these to his subjective complaints. (R. at 13, 15 – 16). The ALJ concluded that Plaintiff experienced mild-to-moderate difficulties. (R. at 13, 15 – 16). As a result, The ALJ included a limitation in his hypothetical and RFC assessment which relegated Plaintiff to low stress work involving only occasional work place changes and work-related decision-making, and only occasional interaction with others. (R. at 14). Plaintiff fails to explain – with any degree of factual specificity – what more the record required of the ALJ. Plaintiff's ability to cope with stress was explicitly addressed by the ALJ, and the court finds no error, here.

Lastly, Plaintiff claims that the ALJ could not properly rely upon the testimony of the vocational expert as substantial evidence, because it was in conflict with the Dictionary of Occupational Titles ("DOT"). (ECF No. 9 at 16 – 17). Specifically, Plaintiff claims that the DOT does not account for the mental limitations presented in the ALJ's hypothetical. (*Id.*). Plaintiff does not specifically identify to which limitations he is referring, but it is unnecessary. The United States Court of Appeals for the Third Circuit has held that inconsistencies between a vocational expert's testimony and the DOT do not necessarily render a Step 5 determination devoid of substantial evidence, meriting remand. *Rutherford v. Barnhart*, 399 F. 3d 546, 557 (3d Cir. 2005) (citing *Boone v. Barnhart*, 353 F. 3d 203, 209 (3d Cir. 2003); *Jones v. Barnhart*, 364 F. 3d 501, 506 (3d Cir. 2004)).

As pointed out by Defendant, a similar issue has been dealt with in the third circuit. (ECF No. 12 at 23). In *Burns v. Barnhart*, 312 F. 3d 113 (3d Cir. 2002), the claimant argued that a vocational expert's testimony conflicted with the DOT, because the DOT did not account for aptitude level as indicated by IQ score. *Id.* at 128. The Court of Appeals held that because the

DOT did not account for aptitude levels, the testimony of the vocational expert – to the effect that the claimant could engage in certain jobs found within the DOT at his particular aptitude level – was not necessarily inconsistent with the DOT.  *Id.*  In the case at present, Plaintiff has provided no evidence of conflict, aside from his assertion that the DOT did not account for certain, unspecified mental limitations posed by the ALJ.  Further, the ALJ specifically inquired as to whether the vocational expert's testimony was consistent with the DOT, and the vocational expert responded in the affirmative.  As such, the court finds no error, here.

**C.   CONCLUSION**

Based upon the foregoing, the ALJ supported his decision with substantial evidence. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C.  636(b)(1)(B) and (C), and Rule 72.D.2  of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.


August 28, 2013

                                                      *s/ Susan Paradise Baxter*
                                                      Susan Paradise Baxter
                                                      United States Magistrate Judge


cc/ecf: All counsel of record.